UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GAI LEVY, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:17-cv-03090-JMS-TAB |
| | ) | |
| THE MARION COUNTY SHERIFF and THE CON- | ) | |
| SOLIDATED CITY OF INDIANAPOLIS AND MAR- | ) | |
| ION COUNTY, | ) | |
|     *Defendants*. | ) | |

## ORDER

Plaintiff Gai Levy was arrested on February 29, 2016 and taken into custody by Defendant

the Marion County Sheriff (the "MCSO") on an outstanding warrant. The next day, the trial court

in which his case was pending ordered him to be held until he could be transported to Marion

County Community Corrections ("MCCC"). One day later, on March 2, a different judge ordered

that he be released to self-report to MCCC, but the MSCO did not receive notice of the new order

and Mr. Levy remained in MCSO custody until he was taken to MCCC on March 3. At MCCC,

he was processed, fitted with an electronic monitoring device, and released. Subsequently, Mr.

Levy initiated this lawsuit,[1] alleging that Defendants detained him past the time that they had au-

---

[1] This case, originally filed in state court and subsequently removed to this Court by Defendants, initially named additional defendants including several Indianapolis Metropolitan Police Department ("IMPD") officers and the IMPD. In that initial Complaint, Mr. Levy asserted claims against the IMPD officers and the IMPD under 42 U.S.C. § 1983 for violating the Fourth and Fourteenth Amendments related to his arrest and detention, and against the MCSO and the Consolidated City of Indianapolis and Marion County (the "City") under § 1983 for violating the Fourth and Fourteenth Amendments by detaining him after legal authority for doing so had ceased. [Filing No. 1-1 at 4-12.] In the operative Amended Complaint, Mr. Levy did not name the IMPD or the officers as defendants.

thority to do so, in violation of the United States Constitution. Defendants have moved for summary judgment on all of Mr. Levy's claims, [Filing No. 37], and to exclude the testimony of Mr. Levy's expert, [Filing No. 56], and both motions are ripe for the Court's review.

It is important to note that Mr. Levy attempts to piggyback onto another case pending in this district, *Driver, et al. v. Marion County Sheriff, et al.*, Cause No. 1:14-cv-2076-RLY-MJD, in which plaintiffs claim that the MSCO has a policy or practice of holding detainees for up to seventy-two hours after they are ordered released. But this case is not *Driver*, and the circumstances surrounding Mr. Levy's detention differ significantly from those at issue there and do not involve the 72-hour delay issue. Mr. Levy's piggyback attempt is unavailing and, as discussed below, the Court grants both of Defendants' motions.[2]

# I.
## MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT

The Court will first consider Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Allison (sic) Shine, [Filing No. 56].

In their Motion to Exclude, Defendants argue that the report filed by Mr. Levy's expert, Alison Shine, did not comply with Fed. R. Civ. P. 26 because she did not disclose her work as an expert witness in at least four other cases and she offered opinions based on material that she did not disclose in her report and that she could not recall at her deposition such that Defendants did not have an opportunity to fairly question her. [Filing No. 56 at 1-4.] Defendants also argue that

---

[2] The MCSO is a separate governmental entity from the other Defendant in this case, the City. *See Grieveson v. Anderson*, 538 F.3d 763, 770-71 (7th Cir. 2008) (explaining that "the [MCSO] has always remained a separate entity from the City of Indianapolis"). The pending motions are brought on behalf of both Defendants, however the parties do not discuss the City's alleged role in Mr. Levy's detention nor does Mr. Levy allege any specific conduct on behalf of the City. The Court follows the parties' lead in omitting separate references to the City, and instead referring to Defendants throughout either as "Defendants" or simply as "the MCSO."

Ms. Shine's testimony should be excluded because she "lacks the fundamental knowledge necessary to offer an expert opinion," since she admitted in her deposition that she does not have any knowledge regarding many of the key issues in this case. [Filing No. 56 at 4.] Specifically, Defendants note that Ms. Shine needed to be able to access the data management systems used by the courts and the MCSO to "understand how the events in this case unfolded," and to "see what codes court staff actually entered…and that controlled Mr. Levy's release and the Sheriff's response to the Court's orders." [Filing No. 56 at 5.] They argue that Ms. Shine also "needed to know how the process for release worked when a court issued a subsequent order for release that changed or altered a previous release order…." [Filing No. 56 at 5.] Defendants contend that Ms. Shine acknowledged during her deposition that she: (1) did not review any of the depositions taken in this case; (2) did not have access to court records to review this case because Mr. Levy obtained an expungement of his conviction; (3) did not understand what the release workflow is that automates the process for inmate releases after a court enters a release code into the database; (4) did not review or understand what the various release codes used in this case were or how they worked; and (5) had no knowledge of the policy that governed the court communicating changes in release orders to the MCSO. [Filing No. 56 at 4-7.] This lack of knowledge, Defendants argue, renders Ms. Shine unqualified to provide the expert opinions she has set forth. [Filing No. 56 at 9-10.]

In response, Mr. Levy argues that Ms. Shine's failure to disclose her previous work as an expert witness did not prejudice Defendants because counsel for Defendants elicited all of the information regarding this prior work during her deposition. [Filing No. 62 at 1-2.] Mr. Levy also argues that Ms. Shine testified during her deposition that she reviewed screenshots of the data received by the MCSO, that Defendants had the opportunity to question her regarding that review at her deposition, and that Ms. Shine worked for MCCC for over ten years and testified regarding

"calculation of jail time at approximately 2,600 criminal hearings in Marion County." [Filing No. 62 at 2-3.] Mr. Levy asserts that where an expert provides non-scientific testimony, as Ms. Shine has, the key issue is whether the testimony "rests upon a reliable foundation and not unsupported speculation…." [Filing No. 62 at 3.] He contends that her written report gave Defendants a reasonable opportunity to effectively cross examine her, and that Ms. Shine's "knowledge and extensive experience will help the jury understand the evidence presented at trial." [Filing No. 62 at 3-4.] Mr. Levy also argues that Defendants waited too long to file their Motion to Exclude. [Filing No. 62 at 2.]

In their reply, Defendants argue that they were prejudiced by Ms. Shine's failure to identify the data she relied upon to prepare her expert report because they did not have a meaningful opportunity to question her regarding the data. [Filing No. 67 at 2.] They note that "[t]his inability to question Ms. Shine about her understanding of the…data turned out to be of critical importance because after her deposition, she provided her affidavit where she testified that she relied on the…data to form her opinion" regarding the court's release order for Mr. Levy. [Filing No. 67 at 2.] Defendants argue that because Ms. Shine admitted that she knew nothing about how the release process works, her opinion lacks the necessary foundation for an expert opinion. [Filing No. 67 at 3.] Finally, Defendants assert that the court records they have obtained show that Ms. Shine's conclusions are incorrect. [Filing No. 67 at 4.]

### 1. *Violations of Rule 26*

The Court first considers whether Ms. Shine's testimony should be excluded based upon her failure to disclose that she had served as an expert witness in four other cases and because she did not disclose the data she relied upon in preparing her expert report. Federal Rule of Civil Procedure 26 provides that an expert report must contain, among other things, "the facts or data

considered by the witness in forming them" and "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition…." Fed. R. Civ. P. 26(a)(2)(B)(ii) and (v). Federal Rule of Civil Procedure 37 states:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). "[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citation and quotation omitted). In considering whether Defendants were prejudiced, the Court considers: "(1) the prejudice or surprise to [Defendants]; (2) the ability of [Defendants] to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Mr. Levy's only response to Defendants' arguments is that Defendants had the opportunity to question Ms. Shine regarding her testimony in other matters and her review of the OMS screenshots during her deposition. Applying the *David* factors, the Court finds that Mr. Levy has not demonstrated that Defendants were not prejudiced by his violations of Rule 26. First, it is undisputed that Defendants did not have information regarding Ms. Shine's past testimony or her reliance on OMS data before her deposition. Second, Mr. Levy has not explained why being able to elicit testimony on those topics at her deposition erases any prejudice to Defendants. Defendants were denied the opportunity to prepare questioning ahead of time based on the undisclosed information and, at least in the case of the OMS data, their questioning of Ms. Shine during her deposition was not fruitful. [*See, e.g.*, Filing No. 56-2 at 32-33 (Ms. Shine testifying that she did not remember what the OMS screenshots showed).] Third, as discussed below, excluding Ms. Shine's

testimony would not disrupt trial because she did not have knowledge, and was not able to testify, regarding the key issues in this case. Finally, while there is no evidence that Mr. Levy acted willfully or in bad faith, this is just one factor in the analysis. Because the first three *David* factors weigh in favor of a finding of prejudice, the Court finds that Ms. Shine's expert testimony should be excluded based on Mr. Levy's violations of Rule 26 and **GRANTS** Defendants' Motion to Exclude on that basis.

### 2. Issues With Substantive Testimony

Defendants also argue that Ms. Shine's testimony should be excluded because she does not have knowledge regarding the key issues in this case. Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid or whether that reasoning or methodology properly can be applied to the facts in issue…. Many factors will bear on the inquiry…." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The principles of *Daubert* apply equally to expert witnesses who will provide non-scientific testimony. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

The court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* (emphasis omitted).

The Court identifies several key issues of which Ms. Shine has no knowledge. Ms. Shine testified that she was not able to review Odyssey records for Mr. Levy (which would reflect the court's orders) because Mr. Levy's record was expunged:

> Q: Let me stop you right there. Did you utilize Odyssey at all as part of your analysis?
>
> A: I tried. That's where I first tried to look into it, and I couldn't find any information on it. So then I called the Court. It was expunged, so I wasn't able to access anything on Odyssey.
>
>             *           *           *
>
> Q: Okay. It sounds like, though, you were never able to access any of the Odyssey systems or OMS systems that showed what event code was entered by court staff with regard to the March 1st order in this case; is that true?
>
> A: That's correct. What I have access to is what the public has access to.
>
> Q: Okay.
>
> A: That doesn't include those details.

[Filing No. 56-2 at 22; Filing No. 56-2 at 29.]

Ms. Shine then testified that she had no knowledge of how court information is transported to the MCSO through a database, what the entry of certain codes by court staff signifies, what

certain codes mean, what event code was entered for Mr. Levy on March 1, how certain codes are communicated to the MCSO, what the MCSO does when it receives a code, what the release work flow is, when the MCSO was finished processing Mr. Levy in response to the March 1 order, and what the effect is when the court issues a new event code that updates or amends a previous release order when the MCSO has already processed an inmate for release:

> Q: What I want to focus on for right now is the part of that process you just explained where the clerk transmits [release] information to the jail in some sort of database. Are you familiar at all with how that works?

> A: No

[Filing No. 56-2 at 17.]

> Q: All right. Do you know what the entry by court staff of an ORC code does in terms of establishing the conditions for an inmate's release from the jail?

> A: No.

[Filing No. 56-2 at 29-30.]

> Q: Do you know what [the SBDOA code] is?

> A: Surety bond something other agency. I don't know what the D would be.

> Q: Okay.

> A: So the answer is no, I don't know what that is.

> Q: Okay, and I think you're already answered this, but you don't know what event code was entered by staff on the Marion County courts regarding the March 1st order for his release?

> A: Correct.

> Q: Okay. When an ORC code is entered by the Marion County courts regarding an inmate, do you know how that is communicated to the Marion County Sheriff's Office?

> A: I don't, no.

Q:  Do you know what steps the Marion County Sheriff's Office takes when it receives an ORC code?

A:  No.

Q:  Do you know what the Marion County Sheriff's Office release work flow is?

A:  No.

*          *          *

Q:  Do you know when the [MCSO] was finished with its processing of Mr. Levy in response to the March 1st order of the Court stating he was to report for Community Corrections?

A:  No.

*          *          *

Q:  Do you know what the effect is, if any, of a court issuing a new event code that updates or amends a previously-issued release order when the [MCSO] has already processed an inmate for release under the earlier-issued release order?

A:  No.

[Filing No. 56-2 at 30-32.]

These are the key issues in this case, and Ms. Shine has no knowledge of them.[3]  Without this knowledge, Ms. Shine is not qualified to testify regarding these issues and her testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue.  *See* Fed. R. Evid. 702.  Accordingly, in addition to Mr. Levy's violations of Rule 26, the Court **GRANTS** Defendants' Motion to Exclude the Testimony of Plaintiff's Expert, Allison (sic) Shine, [56], due to her lack of knowledge regarding the key issues in this case and the Court will not consider Ms. Shine's testimony.

---

[3] Moreover, as discussed in detail below, at least one of Ms. Shine's conclusions – that on February 29, 2016 Judge Snyder ordered that Mr. Levy be released to self-report to MCCC the next business day – is incorrect based on the actual Case Summary for Mr. Levy's criminal case, which Ms. Shine did not review.

## II.
### MOTION FOR SUMMARY JUDGMENT

**A.  Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Cv. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**B. Statement of Facts**

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

*1. The Processing of Detainees at the MCSO*

Since the late 1980s, several agencies and departments within Marion County, including the Marion County criminal courts, used a system called JUSTIS to manage criminal case dockets.

[Filing No. 37-2 at 1-2.][4]  The MCSO used JUSTIS and its own jail management system, JIMS, to track release conditions, sentencing information, and general court orders.  [Filing No. 37-2 at 1-2.]  In June 2014, Odyssey replaced JUSTIS in the criminal courts.  [Filing No. 37-2 at 2.] Additionally, the MCSO began using Offender Management System ("OMS") as its new jail management system.[5]

Odyssey and OMS operate using a series of event codes.  [Filing No. 37-2 at 3.]  When an inmate appears before a court and the court orders the inmate released, the court enters a code into Odyssey that corresponds with the court's release order.  [Filing No. 37-2 at 3.]  The MCSO then receives that code through OMS.  [Filing No. 37-2 at 3.]  When a trial court orders that a criminal defendant is to be released subject to placement at MCCC, that release can be a self-report – meaning that the inmate is released from MCSO custody and reports on his own to MCCC when instructed to do so.  [Filing No. 37-2 at 2.]  For a self-report release, court staff enters the code "ORC" in Odyssey and the code is transported to the MCSO via OMS.  [Filing No. 37-2 at 3;

---

[4] The Court's Practices and Procedures clearly set forth in Appendix A how to cite to exhibits in a brief.  [Filing No. 19.]  The parties have not followed the Court's clear instruction, instead referring to exhibits by name or number, and citing to the "Page ID #" or the actual page number, instead of the ECF page number.  For example, Mr. Levy cites to material on ECF pages 8 and 9 of excerpts from his deposition as "Levi (sic) Dep. at 45:1 – 46:19."  [Filing No. 47 at 2.]  Instead, the citation should be "Filing No. 45-4 at 8-9," which corresponds to the ECF number of the document, and the ECF page numbers where the cited testimony appears.  Similarly, Defendants have not followed the Court's Practices and Procedures, and refer in many cases to the name of the exhibit and the page or paragraph number.  For example, Defendants cite to "Peterson Dec., ¶9."  [Filing No. 38 at 3.]  That citation should instead be "Filing No. 37-2 at 3," which denotes the ECF number of the document and the ECF page number where the cited material appears.  The parties' failure to provide the proper form of citation the Court specifically set forth in its Practices and Procedures made the Court's review of the pending motions unnecessarily cumbersome.  Counsel are cautioned to comply with the Court's Practices and Procedures going forward in this and other cases.

[5] Defendants do not cite to record evidence for the fact that the MCSO began using OMS instead of JIMS as its jail management system.  This fact, however, appears to be undisputed.  [*See* Filing No. 47 at 9 (Mr. Levy stating that "[i]n June 2014, MCSO replaced JIMS with a new platform, [OMS]," and citing to a deposition from another case as support).]

Filing No. 45-17 at 2.]  Conversely, the release can require an inmate to remain in custody until he can be transported directly to MCCC for processing.  [Filing No. 37-2 at 3.]  In that case, court staff enters the code "SBDOA" into Odyssey and the code is received by the MCSO via OMS. [Filing No. 37-2 at 3-4.]  When the MCSO receives an "SBDOA" code, it places the inmate into release work flow, which "[tells] the MCSO that [the inmate] could be released subject to conditions set by the court."  [Filing No. 37-2 at 4.]  During release work flow, an MCSO staff member verifies the code received, checks to see if there are any other conditions or holds on the inmate, and notifies MCCC that the inmate is ready to be picked up.  [Filing No. 45-5 at 9-10.]

Once an inmate is removed from the release work flow (after any holds on the inmate are cleared), a court must take specific steps if it wants to modify its order, and the entry of a new event code from the same court in the same case will not automatically place the inmate back into the release work flow.  [Filing No. 37-2 at 5.]  Specifically, through an arrangement between the MCSO and the courts, court staff must call or email MCSO staff to notify them that a modification to the release order was made in order for the MCSO to become aware of the modification.  [Filing No. 37-2 at 5.]

### 2.  Mr. Levy's Arrest and Detention

On February 29, 2016 at approximately 6:47 p.m., Mr. Levy was arrested and taken into the MCSO's custody on an outstanding warrant.  [Filing No. 45-18 at 1; Filing No. 45-20 at 1.] He was then transported to the Arrestee Processing Center (the "APC") where he was admitted and booked at 8:19 p.m.  [Filing No. 45-19 at 1.]  Mr. Levy remained in custody the evening of February 29, as he attempted to contact his employer to post his bail.  [Filing No. 45-4 at 8-9.]  His employer posted his bail at approximately 11:30 p.m. that evening.  [Filing No. 45-4 at 9.]

The Case Summary for Mr. Levy's criminal case reflects that Mr. Levy appeared in court on March 1, 2016. [Filing No. 53-1 at 2.] The judge set bail at $500 cash and ordered "Upon Satisfaction Of Bond, Party Held For Other Agency." [Filing No. 53-1 at 2.] "Community corrections" is listed under this entry. [Filing No. 53-1 at 2.][6] The code "SBDOA" was entered in Odyssey and received in OMS at 12:25 a.m. on March 1. [Filing No. 55-2 at 2.]

Upon receipt of an "SBDOA" code from the court, Mr. Levy was placed in the release work flow. [Filing No. 37-2 at 4.] On March 1, 2016 at 7:14 a.m., Mr. Levy was transported to the Marion County Jail. [Filing No. 45-23.] Also on March 1, the bail posted by Mr. Levy's employer was accepted and approved. [Filing No. 45-21.] A court appearance for Mr. Levy was scheduled for March 2, 2016. [Filing No. 45-21.]

On March 2, 2016 at approximately 1:30 p.m., Mr. Levy was transported to court for his initial hearing, and a Marion County judge ordered that he be released from custody to self-report to MCCC. [Filing No. 45-21; Filing No. 53-1 at 3 (March 2, 2016 entry on Case Summary for Mr. Levy's criminal case stating "Report to Community Corrections").] The same day at 2:15 p.m., the code "ORC" was entered in OMS, reflecting the order that Mr. Levy be released to self-report. [Filing No. 55-2 at 2; Filing No. 55-2 at 6-7.] At 10:54 p.m., Mr. Levy was booked into

---

[6] Mr. Levy argues that court staff entered a code of "ORC" after his court appearance on March 1, which meant that he should have been immediately released and allowed to self-report to MCCC. [Filing No. 47 at 4.] Mr. Levy's only support for his assertion that he was ordered released at his first court hearing is the Declaration of Alison Shine which, as discussed above, the Court has excluded from evidence, and the OMS print-out attached as an exhibit to his response brief, [Filing No. 45-22]. However, Derek Peterson, Chief Information Officer for the MCSO, explains that the OMS print-out is merely a screen-shot of the latest code entered, and does not reflect the code that was entered on March 1, 2016. [Filing No. 55-2 at 2.] Moreover, Mr. Peterson explains that the certified record of the actual Case Summary entries from Mr. Levy's criminal case reflects a March 1, 2016 entry "Upon Satisfaction of Bond, Party Held for Other Agency." [Filing No. 55-2 at 2.] The "other agency" noted is "community corrections." [Filing No. 55-2 at 2.] The Court finds that a reasonable jury could not conclude that the ORC code was entered after Mr. Levy's first court appearance.

the Marion County Jail.  [Filing No. 45-25.]  The MCSO did not receive any notice from the court that the new ORC code had been entered.  [Filing No. 37-2 at 5-6.]

On March 3, 2016 at 1:35 p.m., the MCSO released Mr. Levy for transportation to MCCC. [Filing No. 37-2 at 6; Filing No. 45-23.]  Mr. Levy waited at MCCC for six hours to have his GPS ankle monitor placed.  [Filing No. 45-4 at 26-27.]  He was released from MCCC around 7:30 p.m. on March 3.  [Filing No. 45-4 at 27.]  Mr. Levy testified that, during his detention, several guards told him that they had seventy-two hours to release him once he was ordered released.  [Filing No. 45-4 at 34 ("Q: Did somebody tell you that the jail had seventy-two hours to release inmates?  A: All of the guards over there when I told them that the judge told me I can go home, they told me the same sentence.  We have seventy-two hours").]

### 3. The Lawsuit

Mr. Levy initiated this lawsuit on September 6, 2017, [Filing No. 1], and filed the operative Amended Complaint on August 21, 2018, [Filing No. 32].  He alleges that the MCSO "instituted and maintained unreasonable policies and practices that resulted in its keeping [him] detained in the Marion County Jail or other holding facilities for an extended period of time after [he] had been ordered released by the Court and/or after legal authority for [his] detention had ceased." [Filing No. 32 at 3.]  He alleges that the MCSO has a practice of holding or detaining prisoners who have been ordered released for an extended period of time, and that this practice is unreasonable.  [Filing No. 32 at 3.]  Mr. Levy asserts claims against Defendants pursuant to 42 U.S.C. § 1983 for unreasonable seizure and detention under the Fourth Amendment and deprivation of liberty without due process under the Fourteenth Amendment.  [Filing No. 32 at 3-4.]  Defendants have moved for summary judgment on all of Mr. Levy's claims.  [Filing No. 37.]

## C. Discussion

### 1. Fourteenth Amendment Procedural Due Process Claim

At the outset, the Court turns to a case decided by the Seventh Circuit after briefing on Defendants' Motion for Summary Judgment was completed, *Lewis v. City of Chicago*. There, plaintiff alleged both Fourth Amendment and Fourteenth Amendment procedural due process claims in connection with his pretrial detention – as Mr. Levy does here. The Seventh Circuit, in resolving a "clear intracircuit conflict," instructed that "[t]he injury of wrongful pretrial detention may be remedied under § 1983 as a violation of the Fourth Amendment, not the Due Process Clause." *Lewis v. City of Chicago*, --- F.3d ----, 2019 WL 289104, at *5-6 (7th Cir. 2019). In doing so, the Seventh Circuit overruled the portion of its decision in *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018), which allowed plaintiffs' procedural due process claim related to pretrial detention to proceed. *Lewis*, 2019 WL 289104, at *5-6 (noting that the *Hurt* decision could not be squared with the Seventh Circuit's later decision in *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 669 (7th Cir. 2018), that "all § 1983 claims for wrongful pretrial detention – whether based on fabricated evidence or some other defect – sound in Fourth Amendment").

Based on the Seventh Circuit's recent instruction in *Lewis*, the Court finds that Mr. Levy's Fourteenth Amendment procedural due process claim fails as a matter of law and **GRANTS** Defendants' Motion for Summary Judgment as to that claim. This leaves Mr. Levy's Fourth Amendment claim for the Court's consideration.

### 2. *Fourth Amendment Claim*

#### a. <u>Applicable Law</u>

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989). Put another way, reasonableness is the "ultimate touchstone" of the Fourth Amendment. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006).

Section 1983 provides that "[e]very person who, under color of any…State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…." 42 U.S.C. § 1983. A § 1983 claim "allow[s] a plaintiff to seek money damages from government officials who have violated his [Constitutional] rights." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

The Supreme Court in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), held that municipalities may be sued under § 1983 when their actions violate the Constitution. The Court limited this liability to actions that may be attributed to the municipality itself: "a municipality cannot be held liable solely because it employs a tortfeasor…on a *respondeat superior* theory." *Id.* at 691 (emphasis omitted). *Monell* "expressly le[ft] further development of this action to another day," *id.* at 695, and subsequent cases have clarified when municipalities may be held liable for constitutional violations. In *Board of the County Commissioners v. Brown*, the Court distilled the *Monell* theory to three elements: First, the plaintiff must identify an action attributable to the municipality itself. 520 U.S. 397, 403-04 (1997). *Brown* and other

cases have identified three ways in which a municipality may "act": written policies; widespread practices or customs; or other actions by a final decision maker. *Id.* Second, the plaintiff must demonstrate that the "municipal action was taken with the requisite degree of culpability," *id.* at 404 – specifically, that the "action was taken with 'deliberate indifference' as to its known or obvious consequences," *id.* at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Finally, the plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404. This requires that the evidence yield "an inference…that the municipality's indifference led directly to the very consequence" of the constitutional deprivation. *Id.* at 409-10.

Within this framework, the Court will consider whether Mr. Levy has identified a policy or practice of Defendants, whether he suffered a constitutional violation caused by that policy or practice, and whether Defendants were deliberately indifferent to the effects of the policy or practice.

      b.  <u>Policy or Practice</u>

Mr. Levy alleges that the MCSO "instituted and maintained unreasonable policies and practices that resulted in its keeping [him] detained in the Marion County Jail or other holding facilities for an extended period of time after [he] had been ordered released by the Court and/or after legal authority for [his] detention had ceased." [Filing No. 32 at 3.] There is a disconnect, however, between Mr. Levy's claims and the policy or practice that is at issue based on the circumstances surrounding Mr. Levy's detention. Mr. Levy's Amended Complaint, and much of the evidence he submits (particularly from the *Driver* case, [*see, e.g.*, Filing No. 45-1 through Filing No. 45-3; Filing No. 45-6 through Filing No. 45-16; Filing No. 46-1], focuses on an alleged general policy or practice of detaining individuals for an extended period of time after the legal authority

to detain them has ceased (sometimes up to seventy-two hours).  The more precise policy or prac-

tice that is at issue here is the MCSO's policy or practice of requiring court staff to notify it of a

change in release orders.  This disconnect likely occurred because Mr. Levy, based at least in part

on Ms. Shine's erroneous conclusions, believed that the ORC code was entered after his first court

appearance.

The Court discerns that Mr. Levy raises two policies or practices that are at play here: (1)

the use of Odyssey and OMS to transmit release codes from the Marion County courts to the

MCSO (the "Transmittal Policy"); and (2) the practice of requiring court staff to contact the MCSO

when a release order has been modified (the "Change Notification Policy").[7]  [*See* Filing No. 47

at 21 (Mr. Levy arguing that the latter practice is an "independent ground[ ] for *Monell* liability").]

Defendants acknowledge that both of these practices exist.  The Court next considers whether

either of these policies or practices resulted in a violation of Mr. Levy's constitutional rights, and

whether Defendants were deliberately indifferent to that consequence.

---

[7]The parties vigorously dispute what evidence Mr. Levy may rely upon to show that the MCSO
had a policy or practice of overdetention.  Specifically, Mr. Levy relies upon several filings and
deposition excerpts in the *Driver* case to support his theory that the MCSO has a policy or practice
of holding detainees for up to seventy-two hours after they are ordered released.  [*See* Filing No.
45-1 through Filing No. 45-3; Filing No. 45-6 through Filing No. 45-16; Filing No. 46-1.]  He also
submits multiple email exchanges relating to a delay in releasing inmates, [Filing No. 45-28
through Filing No. 45-30], newspaper articles relating to a delay in releasing inmates, [Filing No.
45-31 through Filing No. 45-32], and an October 2014 study entitled "A Review of Inmate Release
Procedures at the Marion County Jail," [Filing No. 45-33].  Defendants argue that these documents
are not relevant because the real issue in this case is "how the MCSO and Marion Superior Courts
exchanged information about release orders when one release order issues and a subsequent release
order is issued in the same case involving the same criminal defendant."  [Filing No. 55 at 13.]
The Court finds that evidence from the *Driver* case regarding a general policy of holding inmates
for up to seventy-two hours after legal authority to detain them has ceased is irrelevant and inad-
missible in this case.  As discussed in more detail below, Mr. Levy's detention from the time the
ORC code was entered to his transfer to MCCC was a result of the Change Notification Policy,
which the *Driver* documents do not address.  Moreover, Mr. Levy's alleged overdetention did not
approach the seventy-two hours referenced in the more general policy or practice that is at issue
in *Driver*.

      c.  <u>Constitutional Violation Caused by Policy or Practice and Deliberate Indifference</u>

Defendants do not appear to dispute that detaining an individual for an extended period of time without legal authority to do so is a constitutional violation, instead arguing that they were justified in detaining Mr. Levy up until he was transferred to MCCC because they did not receive notice of the ORC code. Their failure to argue that it was reasonable to detain Mr. Levy for twenty-four hours after the ORC code was entered may be due to the Seventh Circuit's decision in the *Driver* case, which sought certification of five subclasses of individuals who were detained in the Marion County Jail for an allegedly unreasonably long period of time after legal authority to detain them had ceased. The Seventh Circuit found that the district court had erred in concluding that a forty-eight hour time period for releasing individuals was "a critical defining period in establishing the reasonableness of the detention," and was presumptively reasonable. *Driver v. Marion County Sheriff*, 859 F.3d 489, 490 (7th Cir. 2017). The *Driver* court went on to state that, for individuals for whom legal authority for detention has ceased, "all that is left is for the officials to merely process the release. None of the myriad steps required…, between an arrest and a judicial determination of probable cause, are required here; the class members already qualify for release, and all that is left are the ministerial actions to accomplish that release which are within the control of the jail officials. Evidence in the record indicates that the average time period to effect such a release is 2-4 hours in counties in general, and up to 6 hours if problems are encountered, but even if we doubled those times, release still would be accomplished within 12 hours." *Id.* at 491. Exactly what time period is reasonable, and what time period would constitute a constitutional violation, is not addressed by the parties and is an issue of fact that the jury must decide.

Assuming without deciding that it was unreasonable to detain Mr. Levy for approximately twenty-four hours after the ORC code was entered, Mr. Levy still must show that the MCSO's

policy or practice caused the constitutional violation. In the context of a [§ 1983](#) claim, "[c]ausation requires [the court] to analyze the relation between an official's conduct and a resulting injury; when, where, and exactly how that injury occurs is part of the proximate cause question." *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012). Mr. Levy must also show that Defendants were deliberately indifferent to the effects of the policy or practice. More specifically, he must demonstrate Defendants' "aware[ness] of the risk created by the custom" and their "fail[ure] to take appropriate steps to protect" Mr. Levy from that risk. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). The Court considers each policy or practice identified by Mr. Levy in turn.

### i. The Transmittal Policy

In order for Defendants' practice of using Odyssey and OMS to transmit release codes to have caused Mr. Levy constitutional harm, the MCSO would had to have received the ORC code and still continued to detain Mr. Levy. Because it is undisputed that the MCSO did not receive notice of the ORC code before it released Mr. Levy, the Transmittal Policy cannot have been the cause of his harm. Accordingly, Mr. Levy's Fourth Amendment claim based on the Transmittal Policy fails as a matter of law, and the Court **GRANTS** Defendants' Motion for Summary Judgment as to that claim.

### ii. The Change Notification Policy

In Order to analyze the effect of the Change Notification Policy and whether Defendants were deliberately indifferent to that effect, the Court focuses on four different timeframes: (1) arrest on February 29, 2016 at 6:47 p.m. to entry of SBDOA code on March 1, 2016 at 12:25 a.m. after first court appearance; (2) entry of SBDOA code on March 1, 2016 at 12:25 a.m. after first

court appearance to entry of ORC code on March 2, 2016 at 2:15 p.m. after second court appearance; (3) entry of ORC code on March 2, 2016 at 2:15 p.m. after second court appearance to transfer to MCCC on March 3, 2016 at 1:35 p.m.; and (4) transfer to MCCC on March 3, 2016 at 1:35 p.m. to release from MCCC on March 3, 2016 at 7:30 p.m.

- *Arrest to First Court Appearance and Entry of SBDOA Code*

Mr. Levy was arrested at 6:47 p.m. on February 29, 2016, and first appeared in court some time on March 1, 2016. The SBDOA code was received in OMS at 12:25 a.m. on March 1, after this initial appearance. Mr. Levy does not allege that Defendants violated his constitutional rights during this time period. Rather, he focuses on the time period after he had been ordered released by the court. [*See, e.g.*, Filing No. 31 at 2 (Mr. Levy stating in his Statement of Claims that "the Marion County Sheriff instituted and maintained unreasonable policies and practices that resulted in its keeping Plaintiff detained in the Marion County Jail or other holding facilities for an extended period of time after Plaintiff had been ordered released by the Court and/or after legal authority for Plaintiff's detention had ceased").] Because Mr. Levy does not challenge Defendants' authority to detain him during this time period, any claim based on this time period fails as a matter of law and Defendants' Motion for Summary Judgment as to Mr. Levy's Fourth Amendment claim to the extent it is based on this time period is **GRANTED**.

- *First Court Appearance and Entry of SBDOA Code to Second Court Appearance and Entry of ORC Code*

After Mr. Levy had his initial court appearance and the SBDOA code was received in OMS at 12:25 a.m. on March 1, he then appeared a second time in court on March 2 at 1:30 p.m. and the ORC code was entered at 2:15 p.m. As discussed above, the Case Summary for Mr. Levy's criminal case indicates that the court at Mr. Levy's first appearance ordered him "Upon Satisfaction Of Bond, Party Held For Other Agency," and listed "community corrections." [Filing No. 53-1 at 2.]

Mr. Levy has not produced evidence to contradict this order, nor has he produced evidence that indicates that a code other than SBDOA was entered after this first court appearance. Accordingly, his Fourth Amendment claim based on the Change Notification Policy fails as a matter of law for this time period – the MCSO had the legal authority to detain him based on the SBDOA code and, indeed, could not release him against court order. *See* Ind. Code § 36-2-13-5(a)(4) ("The sheriff shall…execute all process directed to the sheriff by legal authority"); *Combs v. Pedersen*, 351 Fed. App'x 130, 131 (7th Cir. 2009) ("A sheriff, warden, or similar custodian who carries out a judicial order that has not been stayed or reversed is not liable under § 1983"). Defendants' Motion for Summary Judgment as to his Fourth Amendment claim to the extent it is based on the time period between the entry of the SBDOA code and the entry of the ORC code is **GRANTED**.

- *Second Court Appearance and Entry of ORC Code to Transfer to MCCC*

After Mr. Levy's second court appearance at 1:30 p.m. on March 2 and the entry of the ORC code at 2:15 p.m. that same day, Mr. Levy was then transferred to MCCC on March 3 at 1:35 p.m. The ORC code reflected the entry on the Case Summary for the March 2 hearing. [*See* Filing No. 53-1 at 3 (Case Summary entries for March 2, 2016 hearing stating "Order to Release From Custody" and "Report to Community Corrections").] This time period of roughly twenty-four hours is the crux of Mr. Levy's Fourth Amendment claim.

In order to succeed on his Fourth Amendment claim related to this time period, Mr. Levy must show that his detention of roughly twenty-four hours after the ORC code was entered was a result of the Change Notification Policy, and that Defendants acted with deliberate indifference to the effects of that policy. *See Brigham City, Utah*, 547 U.S. at 398 (reasonableness is the "ultimate touchstone" of the Fourth Amendment); *Doe v. Vigo County, Indiana*, 905 F.3d 1038, 1045 (7th

Cir. 2018) (policymakers must be deliberately indifferent to consequences of the policy or practice).

As to causation, Defendants acknowledge that the Change Notification Policy was the cause of Mr. Levy's detention during this time period. Whether Defendants acted with deliberate indifference to the effects of the Change Notification Policy, however, presents an insurmountable hurdle for Mr. Levy based on the record evidence in this case. Mr. Levy has not produced any evidence regarding other individuals being overdetained as a result of the Change Notification Policy, and he must do so in order to survive summary judgment. *Johnson*, 325 F.3d at 901 ("summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (internal quotation omitted). This is presumably due to the fact that Mr. Levy thought the ORC code was entered after his first court appearance – in other words, he believed that his release code never changed. While Mr. Levy presents evidence from the *Driver* case indicating that the Marion County courts may have had concerns with other issues involving the use of Odyssey and OMS, he does not present evidence that the courts or MCSO were aware of any issues caused by the Change Notification Policy. Absent evidence that Defendants knew of other instances where the Change Notification Policy was not followed, thereby causing improper detentions, Mr. Levy cannot establish that Defendants acted with deliberate indifference. *Thomas*, 604 F.3d at 303 (a plaintiff generally must point to "more than one instance, or even three" where the policy or practice at issue resulted in a constitutional violation). Consequently, his Fourth Amendment claim based on this time period fails as a matter of law and the Court **GRANTS** Defendants' Motion for Summary Judgment as to this time period.

- *Transfer to MCCC to Release*

Mr. Levy was transferred to MCCC[8] on March 3 at 1:35 p.m. and released after being fitted with a monitoring device at approximately 7:30 p.m. that same day.  While Mr. Levy argues in his response that after his transfer to MCCC he "sat in an office at MCCC from which he was not allowed to leave for another six hours while he waited for MCCC to fit him with his GPS ankle monitor," [Filing No. 47 at 5], he does not appear to base his Fourth Amendment claim on this time period.  [*See* Filing No. 31 (Mr. Levy discussing in his Statement of Claims only the actions of the MSCO in detaining him, and not the actions of MCCC after his transfer there).]  In any event, a Fourth Amendment claim based on this time period would fail as a matter of law because Mr. Levy was not in MSCO custody during this time and the MCCC is not a defendant in this case. To the extent Mr. Levy bases his Fourth Amendment claim on the time period from when he was transferred to MCCC to when he was released by MCCC, the Court **GRANTS** Defendants' Motion for Summary Judgment on that claim.

### III.
#### CONCLUSION

Stripped of his reliance on the *Driver* case, Mr. Levy's claims boil down to one policy or practice, and one twenty-four hour time period:  The Change Notification Policy and its effect on Mr. Levy's detention from the time the ORC code was entered on March 2 to the time he was transferred to MCCC on March 3.  Because Mr. Levy has not produced any evidence showing that Defendants were deliberately indifferent to the possible consequences of the Change Notification Policy, he cannot succeed on a constitutional claim related to his detention during that time period.

---

[8] The MCSO and MCCC are separate entities.  *See* Ind Code § 11-12-1-1, *et seq.* (establishing Indiana's community corrections programs) and Ind. Code § 36-2-13-1, *et seq.* (establishing the office of county sheriff for Indiana counties).

Without evidence of deliberate indifference, he has not shown that his alleged overdetention was anything more than an isolated incident that resulted from negligence. Such conduct cannot support a constitutional claim. *Hoffman v. Knoebel*, 894 F.3d 836, 842 (7th Cir. 2018) (rejecting the notion that "every bureaucratic slip creates a constitutional violation"). For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Exclude the Testimony of Plaintiff's Expert, Allison (sic) Shine, [56], and **GRANTS** Defendants' Motion for Summary Judgment, [37]. Final judgment shall enter accordingly.

Date: 2/11/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**