UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GAI LEVY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | 1:17-cv-03090-JMS-TAB |
| | ) | |
| THE MARION COUNTY SHERIFF and THE CONSOLIDATED CITY OF INDIANAPOLIS AND MARION COUNTY, | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**ORDER**

This case began in August 2017 when Plaintiff Gai Levy filed a Complaint in state court, which was later removed to this Court, alleging that his constitutional rights were violated when, following his arrest, Defendants detained him in county jail longer than legally authorized. On February 11, 2019, this Court granted Defendants' Motion for Summary Judgment and entered Final Judgment in Defendants' favor. [Filing No. 68; Filing No. 69.] Mr. Levy appealed, [Filing No. 70], and the Seventh Circuit Court of Appeals affirmed this Court's judgment on October 18, 2019, [Filing No. 75]; *Levy v. Marion Cnty. Sheriff*, 940 F.3d 1002 (7th Cir. 2019). On February 10, 2020, Mr. Levy filed in this Court a Motion for Relief from Judgment, pursuant to Federal Rule of Civil Procedure 60(b), based on newly discovered evidence. [Filing No. 76.] That motion is now ripe for the Court's review.

**I.
STANDARD OF REVIEW**

Rule 60(b)(2) allows a party to seek relief from a final judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). The motion must be made within

1

a reasonable time not to exceed one year after the date the judgment was entered. Fed. R. Civ. P. 60(c)(1). "Relief under Rule 60(b) is 'an extraordinary remedy . . . granted only in exceptional circumstances.'" *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 949 (7th Cir. 2019) (quoting *Davis v. Moroney*, 857 F.3d 748, 751 (7th Cir. 2017)) (alteration in original).

In a case where summary judgment has been granted, a party seeking relief under Rule 60(b)(2) must show that: "(1) the evidence was discovered after summary judgment; (2) [the party] was diligent in making the discovery; and (3) the evidence would have altered the result reached by the district court." *Parks v. McDonald*, 170 F. App'x 964, 968 (7th Cir. 2006) (citing *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 732 (7th Cir. 1999)). The new evidence must be material and not merely cumulative or impeaching, *Jones*, 188 F.3d at 732, and "must have been in existence at the time of the original judgment or pertain to facts in existence at the time of the judgment," *LAJIM*, 917 F.3d at 950 (citing *Peacock v. Bd. of Sch. Comm'rs of Indianapolis*, 721 F.2d 210, 214 (7th Cir. 1983) (per curiam)). "If any one of these prerequisites is not satisfied, the movant's Rule 60(b)(2) motion . . . must fail." *Jones*, 188 F.3d at 732.

## II.
### BACKGROUND[1]

In relevant part, Mr. Levy alleged that the Marion County Sheriff's Office ("MCSO") instituted and maintained unreasonable policies and procedures that caused him to be detained "for an extended period of time after [he] had been ordered released by the Court and/or after legal authority for [his] detention had ceased," in violation of the Fourth Amendment. [Filing No. 32 at 3.] Specifically, Mr. Levy challenged the MCSO's use of its Offender Management System ("OMS"), which he asserted did not properly communicate with the management system used by

---

[1] The facts in this section are largely taken from this Court's Summary Judgment Order, [Filing No. 68].

the Marion County criminal courts, known as Odyssey, often resulting in detainees being held longer than the courts intended. [*See* Filing No. 32 at 3; Filing No. 47.] Relying primarily on an affidavit by Derek Peterson, Chief Information Officer for the MCSO, [Filing No. 37-2], this Court described the operation of OMS and Odyssey as follows:

> Odyssey and OMS operate using a series of event codes. When an inmate appears before a court and the court orders the inmate released, the court enters a code into Odyssey that corresponds with the court's release order. The MCSO then receives that code through OMS. . . . When the MCSO receives [certain release codes], it places the inmate into release work flow, which "[tells] the MCSO that [the inmate] could be released subject to conditions set by the court." During release work flow, an MCSO staff member verifies the code received, checks to see if there are any other conditions or holds on the inmate, and notifies [Marion County Community Corrections] that the inmate is ready to be picked up.
>
> Once an inmate is removed from the release work flow (after any holds on the inmate are cleared), a court must take specific steps if it wants to modify its order, and the entry of a new event code from the same court in the same case will not automatically place the inmate back into the release work flow. Specifically, through an arrangement between the MCSO and the courts, court staff must call or email MCSO staff to notify them that a modification to the release order was made in order for the MCSO to become aware of the modification.

[Filing No. 68 at 12-13 (internal citations omitted) (alteration to internal quotation in original).]

As noted in this Court's Summary Judgment Order, Mr. Levy was arrested on February 29, 2016 and, following his initial appearance in criminal court on March 1, 2016, it was ordered that, upon satisfaction of his bond, he be transferred directly to the custody of Marion County Community Corrections ("MCCC") for processing. [Filing No. 68 at 13-14.] An "SBDOA" code corresponding to that order was entered into Odyssey and received by OMS on March 1, 2016. [Filing No. 68 at 14.] Accordingly, Mr. Levy was transported to the Marion County Jail, his bail was posted, and he was scheduled for another court hearing the following day. [Filing No. 68 at 14.] Following the second hearing, Mr. Levy was ordered released from custody to self-report to MCCC, and a corresponding "ORC" code was entered into OMS. [Filing No. 68 at 14.] However,

3

the MCSO did not receive any notice from the court that the new ORC code had been entered. [Filing No. 68 at 15.] Mr. Levy was booked into the County Jail on March 2, 2016 and the following day was released from MCSO custody and transported to the custody of MCCC, where he was detained for several hours before ultimately being released to the street. [Filing No. 68 at 14-15.]

In order to prevail on his Fourth Amendment claim, Mr. Levy was required to show: (1) an action attributable to the municipal Defendants, such as a policy or widespread practice; (2) that the action was taken with deliberate indifference to its known or obvious consequences; and (3) a causal connection between the municipal action and the deprivation of a constitutional right. [Filing No. 68 at 17-18 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-10 (1997)).] As to the first element, this Court concluded that Mr. Levy had shown the existence of two policies that constituted municipal actions: (1) the use of Odyssey and OMS to transmit release codes from the Marion County criminal courts to the MCSO (the "Transmittal Policy"); and (2) the practice of requiring court staff to contact the MCSO when a release order has been modified (the "Change Notification Policy"). [Filing No. 68 at 19.] The Court then assumed, without deciding, that it was a constitutional violation to detain Mr. Levy for the roughly 24 hours after the ORC code was entered but before he was transferred to MCCC custody and that the Change Notification Policy caused this violation. [Filing No. 68 at 20-24.] However, the Court concluded that the requirement that Mr. Levy show that Defendants acted with deliberate indifference to the possible effects of the Change Notification Policy presented an "insurmountable hurdle for Mr. Levy based on the record evidence in this case," because he had not submitted evidence that other inmates had been detained for unnecessarily long periods of time as a result of the policy, which he was required to do to survive summary judgment. [Filing No. 68 at 24 (citing

4

*Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)).] Accordingly, the Court granted Defendants' Motion for Summary Judgment. [Filing No. 68 at 25-26.]

The Seventh Circuit Court of Appeals affirmed this Court's judgment. [Filing No. 75; *Levy*, 940 F.3d at 1004.] In doing so, the Seventh Circuit clarified that that the Transmittal Policy and the Change Notification Policy must be considered together, as a single policy ("the Modified Transmittal Policy"), and the issues in this case boiled down to "whether [Mr.] Levy can establish that the Sheriff's adoption and use of this *modified* Transmittal Policy constituted deliberate indifference to a substantial risk of detainees' over-detention and whether that policy's adoption caused his own over-detention." [Filing No. 75 at 16; *Levy*, 940 F.3d at 1011 (emphasis in original).] The Court of Appeals pointed out that the existence of other constitutional violations resulting from the Modified Transmittal Policy would bear on the question of whether there was a policy or practice for purposes of satisfying the municipal action requirement of the claim, but that question was not disputed in this case, and evidence of other constitutional violations was not the only way to demonstrate deliberate indifference. [Filing No. 75 at 17-18; *Levy*, 940 F.3d at 1011-12.] The Court continued:

> Moreover, the record supports Levy's narrative that by continuing to use the Transmittal Policy without any modification, defendants persistently pursued a course of action of selecting and continuing to use a case management system despite many concerns from stakeholders, numerous integration issues, and an inability to process updated release orders from the courts. Thus, if Levy's detention had occurred prior to the Sheriff's adoption of the Change Notification Policy, and he therefore challenged the use of the Transmittal Policy prior to the Change Notification Policy, then there may have been a question for the jury as to deliberate indifference. But Levy's detention occurred after the Sheriff's Office took steps to address the purported problems with the Transmittal Policy.

[Filing No. 75 at 18-19; *Levy*, 940 F.3d at 1012.] Then, relying on *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), the Court concluded that a finding of deliberate indifference could not be made where Defendants' actions showed that they were aware of the potential weaknesses with

the Transmittal Policy but had modified the policy to account for those weaknesses. [Filing No. 75 at 19-20; *Levy*, 940 F.3d at 1012-13.] Specifically, the MCSO (1) developed the release work flow process as part of the Transmittal Policy to ensure that the courts' orders were properly handled and effected, and (2) "developed the Change Notification Policy, a modification of the release workflow process that required court officials to call or email the [MCSO] with any modifications to prior court orders." [Filing No. 75 at 20; *Levy*, 940 F.3d at 1012.] In sum, "without evidence that the [MCSO] knew or should have known that these safeguards would fail, or failed so often that they would obviously result in over-detentions, [the Court could not] conclude that defendants acted with deliberate indifference to the risk of detainees' over-detention. Levy's singular experience does not support a finding to the contrary." [Filing No. 75 at 20; *Levy*, 940 F.3d at 1013.]

### III.
#### DISCUSSION

In support of his Rule 60(b) Motion, Mr. Levy asserts that, after judgment had already been entered in this case, his counsel obtained emails showing that, at the time of his detention, the MCSO had not yet enacted the Change Notice Policy. [Filing No. 77 at 2; Filing No. 77 at 4.] The email chain begins with a message sent on April 27, 2016 by Amitav Thamba to Mr. Peterson and others, with the subject line "Court-MCSO Operational Questions Document." [Filing No. 76-3 at 5-6.] In relevant part, the message, addressed to "MCSO Friends," reads: "Per our review discussion on Monday, 4-25-16, we are beginning a document to outline operational procedural topics so that we have clarity of functioning between the Court and MCSO. This document will be updated on a regular basis based on our constant conversations and questions that arise." [Filing No. 76-3 at 5-6.] Several emails were exchanged, including some authored by Mr. Peterson asking questions about policies related to specific scenarios. [Filing No. 76-3 at 1-5.] Mr. Levy

6

highlighted the final two emails in the chain. [Filing No. 76-3 at 1.] In the penultimate email, sent on July 12, 2016, Mr. Peterson suggested to Jennifer Jenkins that the following text be added to the operational procedures document: "In the event the Court uses an incorrect custody status code, the court staff will update the case with the proper custody status code, and then immediately call MCSO inmate records and notify a supervisor of the incident." [Filing No. 76-3 at 1.] On July 14, 2016, Ms. Jenkins responded: "I don't see this being a problem but would like to add that after the phone conversation a follow up email is sent because I don't want the problems with nothing being documented. I will talk to Amitav and make sure this is good and then I will follow up." [Filing No. 76-3 at 1.]

Mr. Levy asserts that he exercised due diligence during discovery but the emails could not have been obtained during the discovery process because, at that time, Defendants had taken the position that his detention was a result of a failure of a different program, had not suggested that the release work flow process or the Change Notification Policy would be the focus of their summary judgment motion, and had not updated their disclosures to cover those issues. [Filing No. 77 at 4-7.] Mr. Levy argues that the crux of the Seventh Circuit's opinion was the fact that the Change Notification Policy was enacted prior to his detention, and the emails showing otherwise create a question of fact as to whether Defendants were deliberately indifferent to the weaknesses in the Transmittal Policy at that time. [Filing No. 77 at 7-11.] Accordingly, he argues, the new evidence contradicts Mr. Peterson's sworn testimony suggesting that the Change Notification Policy was already in place and would have led this Court to deny Defendants' Summary Judgment Motion had it been considered. [Filing No. 77 at 9-12.]

Defendants respond that the email chain does not contradict Mr. Peterson's testimony and instead is "entirely consistent" with his affidavits. [Filing No. 78 at 6-7.] Specifically, they argue,

7

Mr. Peterson stated in his affidavits that, at the time of Mr. Levy's detention, court staff needed to call or email MCSO staff to let them know of any modifications to an inmate's release order. [Filing No. 78 at 6.]  The email chain, Defendants argue, merely reflects a later attempt to memorialize that concept in writing and does not show that the Change Notification Policy did not exist when Mr. Levy was detained, as "[p]rocesses can, and often do, exist before they are documented." [Filing No. 78 at 7.]  In addition, Defendants argue that Mr. Levy has not demonstrated that he exercised reasonable diligence during discovery. [Filing No. 78 at 7-9.] Finally, Defendants assert that Mr. Levy's motion—though technically filed within one year of this Court's judgment—was not filed within a reasonable time. [Filing No. 78 at 9-11.]

In reply, Mr. Levy argues that Mr. Peterson's affidavit testimony created a false impression that the MCSO and the courts had reached a consensus regarding the Change Notification Policy prior to February 2016, and the newly discovered email chain demonstrates that no such consensus was ever reached. [Filing No. 79 at 1-2.]  He argues that Defendants' response "overlooks that, for the [MCSO's] alleged policy to be in place, court staff must have understood their obligation to call or email the [MCSO]," and "[t]he reasonable inference from this email thread is that the agreement recognized by the Seventh Circuit to have saved the [MCSO] from being deliberately indifferent had not been reached." [Filing No. 79 at 3.]  Mr. Levy also maintains that he exercised reasonable diligence and that his motion—which he filed approximately five months after the evidence was discovered and four months after the Seventh Circuit issued its decision—was filed within a reasonable time. [Filing No. 79 at 4-6.]

As a preliminary matter, the Seventh Circuit has described the one-year time limit for filing a Rule 60(b) motion as an "extreme" outer limit and "cautioned that even a motion filed within a year 'will be rejected as untimely if not made within a reasonable time.'" *Berwick Grain Co. v. Ill.*

*Dep't of Agric.*, 189 F.3d 556, 560 (7th Cir. 1999) (quoting *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986)). What constitutes a reasonable time depends upon the facts of each case, and courts should consider the interest in finality, the reasons for the delay, the party's practical ability to learn of the information earlier, and the prejudice that may result to either party if the judgment is set aside. *Ingram v. Merrill Lynch*, 371 F.3d 950, 952 (7th Cir. 2004) (citing *Kagan*, 795 F.2d at 610).

This Court entered judgment on February 11, 2019; Mr. Levy obtained the email chain on August 28, 2019, [Filing No. 79 at 5]; the Seventh Circuit affirmed on October 18, 2019; and Mr. Levy filed the instant motion on February 10, 2020. Instead of articulating a reason for waiting until the very last day of the one-year period to file his motion, Mr. Levy merely asserts that it was reasonable for him to do so "[g]iven [his] efforts" in this case, and points to cases in which other courts have determined that four or five months was a reasonable time for filing a Rule 60(b) motion. [Filing No. 79 at 5-6.] These arguments largely miss the point that what constitutes a reasonable time is a case-specific and fact-intensive inquiry. Absent any offered justification, the Court finds that it was not reasonable to wait until the last possible day to file his relatively straightforward motion, given that he obtained the evidence upon which it is based over five months before filing.[2]

---

[2] Mr. Levy cites *First Republicbank Ft. Worth v. Norglass, Inc.*, 958 F.2d 117, 120 (5th Cir. 1992), for the proposition that the one-year period is measured from the discovery of new evidence, regardless of the time that has elapsed since the entry of judgment. [Filing No. 79 at 5.] This is not the law of this Circuit and is contrary to the plain language of the Rule. *See* Fed. R. Civ. P. 60(c)(1) (a Rule 60(b)(2) motion must be filed "no more than a year after the entry of the judgment"). There is law in this Circuit—although Mr. Levy does not cite it—stating that the one-year period may begin to run from the decision of the Court of Appeals if that decision substantially alters the District Court's judgment. *Berwick*, 189 F.3d at 559-60. That was not the case here, so the one-year period began to run on February 11, 2019. Regardless, it is not the fact that the motion was filed so close to the deadline that renders it unreasonable, it is the fact that Mr. Levy waited five months after receiving the new evidence and did not provide a reason for doing so.

Even if his motion were timely, Mr. Levy has not demonstrated that the new evidence is likely to change the result in this case. In Mr. Levy's view, the email exchange shows that the Change Notification Policy was not in place in February or March of 2016, when he was detained. But that is not the case. The emails discuss how various policies concerning the operations of the Marion County criminal courts and the MCSO should be memorialized into a written document. They say nothing about when these various policies were initially discussed, formulated, or implemented, and the Court agrees with Defendants that policies "can, and often do, exist before they are documented." [Filing No. 78 at 7.] This is especially true given Mr. Thamba's reference in the emails to continually updating the operating procedures document based on "constant conversations" between the courts and the MCSO. [Filing No. 76-3 at 6.]

Furthermore, the highlighted portions of the email chain state that, in the event that an incorrect code is inputted, court staff should enter the correct code, "immediately call MCSO inmate records and notify a supervisor of the incident," and then follow that call with an email to ensure the matter has been sufficiently documented. [Filing No. 76-3 at 1.] Setting aside the fact that Mr. Levy's case involved two separate judicial orders with different corresponding codes rather than a mistakenly entered code, the fact that Ms. Jenkins suggested in July 2016 that the document reflect that both a call and an email were (or should be) required does not contradict Mr. Peterson's affidavit stating that, at the time when Mr. Levy was in custody, it was understood that "court staff needed to call or email MCSO staff letting them know a modification to that release order was made because entry of a subsequent event code will not place the inmate back into the release work flow." [Filing No. 37-2 at 5; *see also* Filing No. 55-2 at 4 (Mr. Peterson's second affidavit, stating: "The [Marion County] Courts are aware and have accepted the responsibility of

10

notifying the MCSO when a change is made to an inmate's custody status after an earlier release order was entered into Odyssey and the inmate entered the workflow.").]

Neither this Court nor the Seventh Circuit defined the Change Notification Policy as requiring both a call and an email, and even if the email chain could be construed as suggesting a modification to the Change Notification Policy requiring both, that would not undermine the fact that the MCSO and the Marion County Courts had already agreed that some kind of follow-up contact from the courts was required to notify the MCSO of any change to an inmate's release order. [*See* Filing No. 68 at 19 (this Court defining the Change Notification Policy as "the practice of requiring court staff to contact the MCSO when a release order has been modified"); Filing No. 75 at 20; *Levy*, 940 F.3d at 1012 (the Seventh Circuit defining the Change Notification Policy as "a modification of the release workflow process that required court officials to call or email the Sheriff with any modifications to prior court orders").] In other words, to the extent Ms. Jenkins' suggestion was a new concept (as opposed to a clarification of existing protocol to be memorialized in writing) it does not show that court staff and MCSO employees were not already following some form of the Change Notification Policy at the time when Mr. Levy was detained.

In sum, Mr. Levy's motion is untimely and, more importantly, the Court cannot conclude that the email evidence is material or would have changed the result in this case. Specifically, nothing in the email chain demonstrates that either this Court or the Court of Appeals was incorrect in concluding that the Change Notification Policy was implemented to modify the Transmittal Policy prior to Mr. Levy's detention, precluding a finding of deliberate indifference on the part of Defendants. Mr. Levy's Motion for Relief from Judgment must be denied.

## IV.
### CONCLUSION

Because Mr. Levy's new evidence does not meet the rigorous standard for relief under Rule 60(b)(2), his Motion for Relief from Judgment, [76], is **DENIED**.

Date: 5/27/2020

*[signature]*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**